807 F.2d 1207
 Bankr. L. Rep. P 71,623
In the Matter of H. Roger LAWLER, et al., Debtor.
H. Roger LAWLER d/b/a Lawler Cattle Co., Plaintiff-Appellant
Cross-Appellee,
v.
Vernon O. TEOFAN, et al., Defendants-Appellees Cross-Appellee,
 No. 85-1684.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 14, 1987.
Opinion on Denial of Rehearing Feb. 10, 1987.
 
 Thad Grundy, Timothy T. Read, Houston, Tex., Craig R. Goodrum, Dallas, Tex., for plaintiff-appellant cross-appellee.
 Thomas B. Anderson, Jr., Dallas, Tex., for Teofan & Horton.
 Appeals from the United States District Court for the Northern District of Texas.
 Before THORNBERRY, JOHNSON and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 This appeal is lodged by H. Roger Lawler, a debtor in bankruptcy. He claims that an award in bankruptcy of $1,950,865 in attorneys' fees to Richard W. Horton and Vernon O. Teofan is too high. Horton and Teofan are cross-appealing the amount of the award as inadequate.
 
 I. Facts
 
 2
 This dispute over attorneys' fees is the latest, and hopefully the last, disagreement in a series of controversies which have occupied these parties for almost eleven years. The original cause of action arose in January 1976, when Horton filed an involuntary petition in bankruptcy against Lawler in the United States District Court for the District of Nevada on behalf of First National Bank of Nevada, now First Interstate Bank, (the "Bank") and two other creditors. The involuntary petition was filed after the creditors were put on notice that Lawler was engaging in a complicated series of transfers of his assets to his corporation and to his family trusts. Lawler moved to dismiss the involuntary petition on the ground that his residence and place of business were in Texas. The Nevada Bankruptcy Court denied the motion and, instead, transferred the case to the Northern District of Texas.
 
 
 3
 Horton retained Teofan, a Dallas attorney, as local co-counsel for the petitioning creditors. They then entered into an agreement with the Bank, whereby the Bank would pay any attorneys' fees related to Horton and Teofan's services, with the understanding that Horton and Teofan would refund any monies expended by the Bank in the event they were compensated by the Lawler estate. Horton and Teofan received approximately $70,000 from the Bank as a result of this arrangement.
 
 
 4
 On January 16, 1978, Lawler consented to adjudication in bankruptcy. He stated that his debts were unknown and that his assets available to creditors were valued at $38,000. Horton and Teofan were appointed to represent L.E. Creel, III., the newly-appointed receiver. They continued to represent Creel after he became the trustee in bankruptcy on April 2, 1978.
 
 
 5
 Horton and Teofan took an active role in the assembly of Lawler's assets. They filed copies of the involuntary petition in the real estate records to prevent Lawler from transferring realty titled in his name. They also recorded lis pendens notices against property Lawler had transferred in order to prevent further transfers. After Lawler's adjudication as a bankrupt, Horton and Teofan filed voluntary petitions in bankruptcy on behalf of Lawler Corporation and Lawler Management Company, which increased the estate by $850,000 and $1,850,000, respectively. This action also served to bring Lawler's corporation and the Lawler family trusts within the jurisdiction of the bankruptcy court.
 
 
 6
 Horton and Teofan then filed a complaint to have the corporation and the family trusts declared the alter ego of Lawler. On June 18, 1979, the bankruptcy court issued its alter ego order, stating that the corporation and the trusts were, from their inception, the same entity as Lawler. This decision transformed Lawler's estate from one with essentially no assets to one with 29 million dollars in assets. Soon thereafter, Lawler filed for Chapter XI reorganization, and Horton and Teofan were appointed as counsel to the operating trustee.
 
 
 7
 A final settlement plan was confirmed on April 30, 1984. It provided for full payment to all creditors, a total amount of approximately $8,700,000, plus ten percent interest per annum as of the commencement date of the case. Additionally, the Internal Revenue Service received $5,000,000 in settlement of any and all existing claims against Lawler. Complete compliance with the settlement plan revested approximately 8.8 million dollars in Lawler personally.
 
 
 8
 After the plan was approved, Horton and Teofan filed an application for a total of $4,000,000 in attorneys' fees, asserting the element of contingency involved in their representation as a major factor in the amount requested. Included in the amount was $750,865 already received as interim compensation, plus $7,582.50 in expenses. Lawler objected to the alleged contingent nature of the fee, and the bankruptcy court held a hearing on the application on April 6, 1984. After hearing the testimony of several witnesses, the bankruptcy court awarded Horton and Teofan a joint fee of 1.2 million dollars in addition to the interim compensation. The total amount of attorneys' fees awarded to Horton and Teofan thus was approximately 1.9 million dollars plus expenses.
 
 
 9
 The district court affirmed the decision of the bankruptcy court. Lawler has appealed on the ground that the bankruptcy court abused its discretion by failing to follow the correct procedures in determining the amount of the fees awarded and by not awarding fees at the lower end of the spectrum of reasonableness. Horton and Teofan's cross-appeal claims that the district court abused its discretion by awarding fees that were inadequate.
 
 II. Determination of the Lodestar
 
 10
 This case is governed by the Bankruptcy Act of 1898 rather than the Bankruptcy Reform Act of 1978, 11 U.S.C. Sec. 101 et seq. (1982). Section 64(a)(1) of the old Bankruptcy Act, 11 U.S.C.A. Sec. 104 (Supp.1976) and Rule 219(c)(1) of the Rules of Bankruptcy Procedure provide that the amount of compensation awarded for legal services to a bankrupt estate must be "reasonable". The cases decided under the Bankruptcy Act of 1898, which therefore are controlling in this instance, require the use of "economy" in awarding attorneys' fees. See Matter of First Colonial Corporation of America, 544 F.2d 1291, 1299 (5th Cir.), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977) ("the bankruptcy judge ... should award an amount which is 'at the lower end of the spectrum of reasonableness' ") (citation omitted). See also In re U.S. Golf Corp., 639 F.2d 1197, 1201 (5th Cir.1981); Rose Pass Mines, Inc. v. Howard, 615 F.2d 1088, 1092 (5th Cir.1980); In re TMT Trailer Ferry, Inc., 577 F.2d 1296, 1303-04 (5th Cir.1978) (noting strong policy of the Bankruptcy Act of 1898 to use "economy" in awarding attorneys' fees.)[1]
 
 
 11
 The appropriate procedure for determining a reasonable award of attorneys' fees is set out in Johnson v. Georgia Highway Express, 488 F.2d 714, 717-19 (5th Cir.1974). The Johnson standard consists of twelve factors which are to be applied by the court in determining the amount of the fees. The factors are: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.
 
 
 12
 We first applied the Johnson factors to an award of attorneys' fees in bankruptcy in Matter of First Colonial Corporation of America, 544 F.2d 1291, 1299 (5th Cir.), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). First Colonial also added two considerations to be used in setting a fee in a bankruptcy case. "First, the strong policy of the Bankruptcy Act [of 1898] that estates be administered as efficiently as possible demands recognition" and second, the "number of peculiarities of bankruptcy practice ... which could lead to the award of duplicative fees or compensation for non-legal services if overlooked." Id.
 
 
 13
 First Colonial further clarified the procedures to be followed in determining a reasonable award of attorneys' fees. The bankruptcy court is to "ascertain the nature and extent of the services supplied by the attorney. To this end, each attorney seeking compensation should be required to file a statement which recites the number of hours worked and contains a description of how each of those hours was spent." Id. "Once the nature and extent of the services rendered have been determined, the bankruptcy judge must assess the value of those services." Id. at 1300. "When both of these steps have been completed, and the amount of compensation that is reasonable has been determined, the bankruptcy judge must briefly explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors listed in Johnson affected his decision." Id.
 
 
 14
 The Johnson standard has been further refined by this Court's adoption of the "lodestar" method of calculating attorneys' fees. See Graves v. Barnes, 700 F.2d 220, 222 (5th Cir.1983); Copper Liquor, Inc. v. Adolph Coors Co., 684 F.2d 1087, 1092-93 (5th Cir.1982). "The 'lodestar' is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. The lodestar is then adjusted to reflect other factors such as the contingent nature of the suit and the quality of the representation." Copper Liquor, 684 F.2d at 1093 (citing Copeland v. Marshall, 641 F.2d 880, 891-94 (D.C.Cir.1980) (en banc)).
 
 
 15
 In determining the lodestar, the bankruptcy court found that Horton and Teofan and their assistants devoted 5,693.65 hours of nonduplicative work time to this case. The court then established reasonable hourly rates for all of the persons who worked on the case.[2]
 
 
 16
 Lawler has several objections to the calculations made by the bankruptcy court. In reviewing his contentions, this Court emphasizes that the bankruptcy court has broad discretion in determining compensation for services performed in a bankruptcy proceeding and that its exercise of discretion will not be disturbed unless it has been abused. In re Consolidated Bancshares, Inc., 785 F.2d 1249, 1252 (5th Cir.1986). The bankruptcy court is more familiar with the actual services performed and "has a far better means of knowing what is just and reasonable than an appellate court can have." First Colonial, 544 F.2d at 1298 (citation omitted).
 
 
 17
 Lawler generally objects to the procedures used by the bankruptcy court in determining the amount of the fees. It is clear from the record, however, that the bankruptcy court applied the Johnson and First Colonial factors in the lodestar context mandated by Copper Liquor. There is no evidence that the bankruptcy court abused its discretion in so doing.
 
 
 18
 Lawler also claims that Horton and Teofan provided insufficient information as to the amount of hours expended on the case and that the bankruptcy court abused its discretion in setting the lodestar without such information. The bankruptcy court found specifically that "the time logs presented by the applicants with their application describe the services rendered by the applicants in sufficient detail and, together with the record of this case, adequately inform the Court as to the extent and quality of the applicants' services." In re Lawler, 47 B.R. 673, 676 (Bankr.N.D.Tex.1985). While the time sheets submitted by Horton and Teofan did not reach an ideal level of completeness, it cannot be said that they lack the necessary information. They show the amount of time devoted to the case by each of the involved persons. The records also show that the work was not duplicative or otherwise prohibited by the Bankruptcy Act.
 
 
 19
 A fee application must be sufficiently detailed to allow the bankruptcy court to make an independent evaluation of whether the hours claimed are justified. The application does not, however, need to "detail the exact number of minutes spent nor the precise activity to which these hours are devoted...." Riddell v. National Democratic Party, 545 F.Supp. 252, 257 (S.D.Miss.1982). This Court has specifically rejected the D.C. Circuit's rule that contemporaneous, complete, and standardized time records must be kept and produced before any fee awards will be allowed. Copper Liquor, 684 F.2d at 1094.
 
 
 20
 We do not accept Lawler's contention that the bankruptcy court abused its discretion in determining the lodestar by failing to have Horton and Teofan specify the amount of time devoted to each phase of the bankruptcy proceedings and the time spent preparing the fee application. Although Horton and Teofan provided legal services for the petitioning creditors, the receiver, the trustee in bankruptcy, and the operating trustee, those services were rendered for the common purpose of successfully resolving the Lawler bankruptcy. The services also will be paid from a single source, the Lawler estate, irrespective of the representative capacity in which they were performed. It would have been wasteful and inefficient to require Horton and Teofan to provide an elaborate breakdown of their activities when the information was readily available in the time records submitted to the bankruptcy court.
 
 
 21
 Lawler also objects to the bankruptcy court's use of current hourly rates to compute the amount of the lodestar. He contends that the court abused its discretion by failing to consider the actual hourly rates charged by Horton and Teofan over the course of the proceedings. It already has been determined, however, that attorneys' fees may be calculated at the rate prevailing at the time of the application. Graves, 700 F.2d at 224. No expert testimony was required as to the current hourly rates for attorneys since the bankruptcy and district courts are already very familiar with prevailing community standards. First Colonial, 544 F.2d at 1300. Application of Horton and Teofan's present rates in this case compensates them for the delay in payment.[3]
 
 
 22
 For these reasons, we find that the bankruptcy court did not abuse its discretion in determining the amount of the lodestar in this case.
 
 
 23
 III. Application of the Johnson Factors to the Lodestar
 
 
 24
 The bankruptcy court applied the twelve Johnson factors to the circumstances of this case. In re Lawler, 47 B.R. at 680-82. Lawler raises several objections to the court's analysis of the Johnson factors and its subsequent enhancement of the lodestar. Only one of these claims, arising under the sixth factor, fee contingency, is worthy of detailed consideration. The court determined that "[t]he fee for the applicants in this case was substantially contingent" and used this finding to increase the lodestar by a 2.3 factor. 47 B.R. at 679. Lawler contends that the bankruptcy court abused its discretion by finding that the case was substantially contingent when, in fact, a risk of nonpayment existed only for a limited period of time. The record shows that there is validity to this contention.
 
 
 25
 Horton and Teofan strongly urge the correctness of the bankruptcy court's finding as to the contingent nature of their representation. Horton testified at the fee hearing that he would not have taken the original case on any other basis. There is, however, no written agreement between Horton and Teofan and any of the other parties which could function as a contractual contingency fee arrangement. In fact, when Horton and Teofan were representing the Bank and the other petitioning creditors at the outset of this case, they had an agreement with the Bank that it would pay for all their fees and expenses and that it would seek repayment only in the event Horton and Teofan were compensated by the estate.
 
 
 26
 There is no doubt that Horton and Teofan's representation of the receiver and the trustee began as truly contingent. The risk of nonpayment disappeared, however, after the alter ego issue was decided in June of 1979. Their efforts transformed the estate from one with virtually no assets to one with 29 million dollars in assets. But as a result of this admittedly outstanding victory their work was no longer contingent.
 
 
 27
 The time records submitted by Horton and Teofan reveal that the hours spent working on a contingency basis before the contingency ended accounted for only forty-three percent of the total time expended on the Lawler bankruptcy.[4] There is no question that the attorneys are entitled to a strong application of the contingency factor for their outstanding work in resolving the contingency. But once it was resolved, its further use as a factor in the fee was not justified. Thus, the contingency factor should not be applied to the entire period of representation by counsel when a substantial portion of the legal services were provided on a noncontingent basis. Cf. Flowers v. Wiley, 675 F.2d 704, 707 (5th Cir.1982) (an award of attorneys' fees will not be enhanced by a contingency factor for that portion of the award which relates to hours spent determining attorneys' fees); Tasby v. Wright, 550 F.Supp. 262, 272 (N.D.Tex.1982). The bankruptcy court, therefore, abused its discretion by concluding that the entire fee was substantially contingent and by applying the contingency factor to all of the work of the attorneys. In the light of this error, this Court is obligated to reduce the attorneys' fees awarded to Horton and Teofan to an amount that corrects the excessive application of the Johnson contingency factor.
 
 
 28
 At the hearing on Horton's and Teofan's application for the final award of attorneys' fees, three witnesses testified as to the reasonableness of the proposed award. David Kline, a former bankruptcy judge in Oklahoma City and past president of the National Conference of Bankruptcy Judges, testified that the requested fee of $4 million was "reasonable and sustainable." 47 B.R. at 676. Kline also stated, however, that he personally would probably not award a fee in that amount. The court's own expert witnesses, John Blinn, a former bankruptcy judge in the Northern District of Texas, and Rufus Garrett, a bankruptcy practioner with over thirty years of experience in Fort Worth, independently arrived at the figure of 1.4 million dollars as an appropriate total fee for Horton and Teofan.
 
 
 29
 All of the experts agreed that "this was an unusual case, with novel legal questions presented and with exceptional results obtained for creditors." Id. We acknowledge the accuracy of this statement, and Horton and Teofan are properly commended for outstanding professional accomplishment in this case. They are well entitled under the application of the Johnson factors to an award significantly above the lodestar. Upon consideration of the expert testimony given at the fee application hearing and our own evaluation of the extent of applicable contingency, we determine that 1.4 million dollars is the reasonable and appropriate amount of attorneys' fees to which Horton and Teofan are entitled. With the exception of the contingency factor, we otherwise agree with the bankruptcy court's evaluation of the Johnson factors and do not consider them in detail.
 
 
 30
 A total award of 1.4 million dollars increases the lodestar by a factor of approximately 1.7. An increase over the lodestar in this amount acknowledges the exceptional work done by Horton and Teofan, including additional compensation for the period of contingency, while still remaining within the "lower spectrum of reasonableness" as required by the Bankruptcy Act of 1898. We conclude that the cross-appeal of Horton and Teofan must be denied, since the bankruptcy court did not abuse its discretion by awarding a fee that was inadequate.
 
 Conclusion
 
 31
 The bankruptcy court erred in determining that the fees in this case were to be based upon a full contingency factor. As a result of this error, the court's award of fees is also flawed because it falls short of an adequate application of the strong policy of the Bankruptcy Act of 1898 favoring the use of economy in the award of attorneys' fees. Thus, the decision of the district court affirming the judgment of the bankruptcy court must be reversed in part. Judgment will be entered in the total amount of $1,400,000 plus expenses and less fees already paid.
 
 
 32
 AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
 
 ON PETITION FOR REHEARING
 PER CURIAM:
 
 33
 IT IS ORDERED that the petition for rehearing filed in the above entitled and numbered cause be and the same is hereby DENIED. In doing so, the Court points out that the issue of interest on the fees awarded the attorneys was not raised on appeal. It therefore follows that the original judgment for interest remains intact, and the attorneys are entitled to interest in accordance with that judgment on the fees as finally determined by this Court in its decision of January 14, 1987.
 
 
 
 [1]
 The principle of economy has been eliminated by the Bankruptcy Reform Act of 1978. See 11 U.S.C. Sec. 330(a)(1) (1982) (compensation for attorneys shall be based upon "the cost of comparable services other than in a case under this title.")
 
 
 [2]
 
 Reasonable
Person Hours Rate Total
------ ----- -------- -----
Teofan 2,433.50 $175.00 $425,862.50
Guysi 577.50 120.00 69,300.00
McElreath 276.00 125.00 34,500.00
Sartin 37.25 105.00 3,911.25
Petrozelka 22.50 90.00 1,980.00
Cockerell 13.50 105.00 1,391.25
Gutman 5.00 120.00 600.00
Fuller 4.75 90.00 427.50
Weisbrod 4.00 105.00 420.00
Ungerman 3.25 165.00 536.25
Sanchez 1.00 70.00 70.00
Horton 1,461.45 175.00 255,753.75
Shaffer 13.50 75.00 1,012.50
Good 8.60 75.00 645.00
Pickering 62.00 75.00 4,650.00
Douthit 769.85 55.00 42,341.75
 -------- -----------
 TOTAL 5,693.65 $843,401.75
 
 
 [3]
 Horton testified at the fee application hearing on April 6, 1984, that his hourly rate was between $75 and $100 at the commencement of this case in 1976 and that his present hourly rate was $175. Teofan only testified as to his current hourly rate of $200; however, he gave no indication that his rate in 1976 was more than the rate he is presently receiving. This Court has already approved the use of current hourly rates for the purpose of compensation. See Graves, 700 F.2d at 224
 
 
 [4]
 Horton and Teofan devoted a total of 5,693.65 hours to these proceedings. Of that time, only 2,473.7 hours were related to the period of contingency between January 16, 1978, the date Lawler was adjudicated a bankrupt, and June 18, 1979, the date of the alter ego decision. The remaining 3,219.95 hours of work were not subject to a contingency